UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DEVIN FLOYD,<br><br>Plaintiff,<br><br>v.<br><br>SABER FITNESS HEGENBERGER, LLC,<br><br>Defendant. | Case No. 24-cv-01278-TSH<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 109 |

## I.    INTRODUCTION

Plaintiff Michael Devin Floyd, proceeding *pro se*, filed a complaint for civil rights violations and contract claims against Saber Fitness Hegenberger, LLC ("Saber"), alleging that Saber improperly terminated Floyd's gym membership.  ECF No. 52 (Third Amended Complaint). Pending before the Court is Saber's Motion for Summary Judgment.  ECF No. 109 ("Mot.").  For the reasons stated below, the Court **GRANTS IN PART and DENIES IN PART** the motion.[1]

## II.    BACKGROUND

**A.    Factual Background**

Saber, an LLC whose sole member is a citizen of New York, owns and operates a Planet Fitness gym facility in Oakland, California.[2]  Third Amended Complaint ("TAC") ¶ 5 (ECF No. 52); Answer ¶¶ 5, 12 (ECF No. 57); *see* ECF No. 43 ("the citizenship of Defendant is New

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 16, 29, 36.

[2] The Planet Fitness gym facility is located at 610 Hegenberger Road in Oakland, California. TAC ¶ 3; Answer ¶ 3 (hereinafter the "Oakland Planet Fitness").  On December 13, 2022, the Oakland Planet Fitness was acquired by Taymax Group, LP ("Taymax").  Mot. at 6:6–13.

York").  Floyd is a California resident who opened a gym membership account at the Oakland Planet Fitness on September 17, 2021.  TAC ¶ 12; Answer ¶ 12.  Floyd is an African American male who indicates that due to his heterosexual orientation, he seeks out and interacts with women.  TAC ¶¶ 22–23; Floyd's Opposition to Saber's Motion for Summary Judgment ("Opp.") at 14:5–6.

Floyd alleges that Saber improperly terminated his gym membership at the Oakland Planet Fitness, and that Saber discriminated against him and breached its contract with him.  TAC ¶¶ 21–31.

### 1.    Activities Prior To The Parties' Membership Agreement[3]

Floyd initially opened an all-access gym membership at the Planet Fitness in Jacksonville, Florida on February 13, 2019.  TAC ¶ 9; Mot. at 1:26–28.  The all-access membership allowed Floyd to access all Planet Fitness locations in the United States.  TAC ¶ 9; Mot. at 1:28–2:1.

In July 2021, Floyd traveled to San Jose, California to visit family and went to a Planet Fitness location there.  TAC ¶ 9.  In July 2021, Brandon Romero was the Director of Area Operations and employed by Saber Fitness IE, LLC—Romero was responsible for overseeing the daily operations of multiple Bay Area gyms, including the San Jose gym and the Oakland Planet Fitness.  Declaration of Brandon Romero ("Romero Decl.") ¶¶ 1–2 (ECF No. 110); Floyd's Controverting Statement of Facts ("Pl.'s CSF") ¶¶ 11–12 (ECF No. 116-2).  In his position, Romero was responsible for "ensuring execution of company standards, managing staff, implementing policies, and evaluating business performance, among other duties."  Saber's Responses to Floyd's Interrog. at 4 (ECF No. 116-14).  Romero remained in this position until June 24, 2022.  Romero Decl. ¶ 1.

Saber asserts that on July 23, 2021, an employee at the Florida gym noted—after speaking with an employee at the San Jose gym—that Floyd was "disruptive," "hits on staff," "says vulgar words," and "slams weights" while at the San Jose gym.  Mot. at 2:21–28 (citing Declaration of

---

[3] Floyd objects to all evidence regarding his activities that occurred at other gyms prior to his membership at the Oakland Planet Fitness.  Opp. at 6:7–9.  This objection is addressed below with Floyd's other objections.

United States District Court
Northern District of California

Liam N. Gaarder-Feingold ("Feingold Decl."), Ex. 1 (Member Notes for Floyd), at 7 (ECF No. 112-1)). Floyd disputes this allegation. Pl.'s CSF ¶ 10. Floyd was subsequently told by the Florida gym that there was a complaint about his "vulgarity and personality." TAC ¶ 9. Staff at the San Jose gym told Floyd that he was no longer allowed there, but they did not provide any further details. *Id.*

Floyd then began using other Planet Fitness gyms in the Bay Area, including in Fremont and in Hayward. TAC, Ex. 2 (ECF No. 52-1, at 10); Romero Decl. ¶ 3. According to Floyd, "other incidents occurred" at these gyms, and his home gym in Florida subsequently informed him that his membership was cancelled. TAC ¶ 10; *see* TAC, Exs. 3–4 (emails between Floyd and the Florida gym) (ECF No. 52-1, at 15). Saber asserts that the Florida membership cancellation was prompted by an email, sent on September 9, 2021, from the Chief Operating Officer at Planet Fitness to Planet Fitness World Headquarters, stating that Floyd caused numerous problems at the Fremont and Hayward gyms. Mot. at 3:10–22 (citing Feingold Decl., Ex. 1, at 35–36). Floyd disputes this allegation. Pl.'s CSF ¶¶ 13, 15.

On September 9, 2021, an employee from the Florida gym, Jake Saltzman, sent Floyd an email stating:

> During your recent visits to Planet Fitness in the California area, you had multiple policy infractions which violates your agreement you signed upon signing up initially in Florida. As a result, we have decided to terminate your membership effective immediately. You will no longer be eligible to sign up for a new membership due these violations. Also, you will not be billed moving forward from today.

TAC, Ex. 3; Feingold Decl., Ex. 1. Floyd disputes that he violated any policies at gyms in California. Pl.'s CSF ¶ 17. After this communication, Floyd did not access the San Jose, Fremont, or Hayward gyms. *Id.* ¶ 19.

## 2.    The Parties' Membership Agreement

After the Florida gym canceled his membership, Floyd decided to open a gym membership at the Oakland Planet Fitness. TAC ¶ 12. All individuals who wish to use the Oakland Planet Fitness must enter into a Membership Agreement with Saber. Declaration of Mark Christina ("Christina Decl.") ¶ 5 (ECF No. 111); Pl.'s CSF ¶ 5. As such, the parties entered into a written

United States District Court
Northern District of California

3

Membership Agreement (the "Agreement") regarding Floyd's membership at the Oakland Planet Fitness. TAC ¶ 12; Answer ¶ 12. Floyd filed a copy of the Agreement, executed on September 17, 2021, with his complaint. *See* TAC, Ex. 5 (Agreement) (ECF No. 52-1, at 24).

The first page of the Agreement states:

> I agree to comply with Planet Fitness' membership policies and club rules that may be communicated to me from time to time, whether in writing, electronically, through club signage or verbally. Planet Fitness may, in its sole discretion, modify any policy or club rule at any time and from time to time without advance notice. Planet Fitness reserves the right, in its sole discretion, to refund the pro-rated cost of unused services and terminate my membership immediately for violation of any membership policy or club rule or for any other reason not prohibited by applicable law. By signing below, I acknowledge and agree to all of the terms contained on the front and back of this agreement.

Agreement at 1. Under the "Membership" section, the Agreement states, in pertinent part:

> A) General: Your membership permits you to use certain of Planet Fitness' premises, facilities, equipment, digital content, and services. You are required to pay the dues and fees required by this agreement even if you do not use the facilities, equipment, digital content, or services made available to you. Your access and right to use Planet Fitness' premises, facilities, equipment, digital content, and services may be limited, removed, or cancelled as provided for by this agreement or in accordance with applicable law. Your membership is subject to all current company policies, rules, terms, conditions and limitations including, PF Black Card® benefit rules, transferability rules, guest privilege rules, and dress code.

*Id.* at 2. Under the "Rules and Regulations" section, the Agreement states:

> You agree to follow Planet Fitness' membership policies and club rules, some of which may be found at www.planetfitness.com. Planet Fitness may, in its sole discretion, modify the policies and any club rule without notice at any time. Club rules vary by location and all signs posted in a club or on the premises and any verbal communication from Planet Fitness shall be considered a part of the club rules. Should you have any questions about our policies and rules, you may inquire at the front desk. Planet Fitness reserves the right, in its sole discretion, to refund the pro-rated cost of unused services and terminate your membership at any time, effective immediately, for violation of any membership policy or club rule or for any other reason not prohibited by applicable law.

*Id.*

On the publicly available website for Planet Fitness (www.planetfitness.com), there is an

1    Anti-Harassment Policy that states:

2           Planet Fitness does not tolerate verbal or physical harassment of any
       member or team member for any reason.  Violations by members may
3           result in cancellation of membership.

4           If any member experiences harassment:

5           The incident of harassment shall be reported to a Planet Fitness team
       member or manager as soon as possible
6

7           Issues that are not resolved in a manner satisfactory to a member may
       also be directed to ContactUs for.  Please, fill out the form and under
       the question, 'What can we help you with?' please select 'Staff Issue.'
8

9    Christina Decl. ¶ 4; Christina Decl., Ex. 2 (Anti-Harassment Policy) (ECF No. 111-2).

10          **3.     Activities During The Parties' Membership Agreement**

11          After entering into the Agreement, Floyd accessed the Oakland Planet Fitness and the

12   Milpitas Planet Fitness.  TAC ¶¶ 12–19.  At this time, staff at all gyms supervised by Romero

13   were trained to inform Romero of any incidents at the gym that resulted in a note on the gym

14   member's profile.  Romero Decl. ¶ 6.

15          On October 12, 2021, a state investigator contacted Romero by email requesting evidence

16   relevant to an unrelated case where Floyd is a party.  Pl.'s CSF ¶ 25 (citing Opp., Ex. 13).

17   Romero did not respond to this email, nor did he respond to subsequent email requests from the

18   investigator.  *Id.*  The evidence requested from Romero was "crucial" to Floyd's other case.

19   Affidavit of Michael Floyd ("Floyd Aff.") ¶ 11 (ECF No. 116-1).

20          Saber asserts that on October 13, 2021, a staff member noted on Floyd's account:

21          Member always slams the weights but claims that he tried to put it
       down slowly.  Staff has reminded him multiple times. -AL[.]
22

23   Mot. at 4:28–5:1 (citing Feingold Decl., Ex. 1, at 6); Pl.'s CSF ¶ 23.  A staff member approached

24   Floyd that day and told him not to slam the weights; Floyd told the staff member that he would be

25   more careful.  TAC ¶ 14; Pl.'s CSF ¶ 23.  Staff purportedly notified Romero of the note on

26   Floyd's account.  Romero Decl. ¶ 6.  Romero recognized Floyd's name from issues reported at the

27   San Jose and Hayward gyms and "instructed the staff to report any issues they had with [Floyd]."

28   *Id.*

United States District Court
Northern District of California

Starting on October 29, 2021, Floyd attempted to contact Romero several times by email regarding the evidence for his unrelated case. TAC ¶ 15 (citing TAC, Exs. 7–8). Romero did not respond to Floyd's emails, and Floyd was unable to obtain this "exculpatory evidence." *Id.*; Opp. at 10:15–11:6 (citing Opp., Exs. 13–17).

After Romero instructed staff to report issues with Floyd, Floyd felt that gym members and gym staff were "watching [him]." TAC ¶ 16. On November 10, 2021, as Floyd was leaving the Oakland Planet Fitness, a staff member said to him, "have a good day, bum." *Id.*; Floyd Aff. ¶ 12; *see also* Pl.'s CSF ¶ 29 (citing Feingold Decl., Ex. 1, at 6 ("asked if misa called him a bum when misa was just telling him to have a good day lol")).

Saber asserts that on December 1, 2021, a staff member noted on Floyd's account:

> [There] have been multiple instances where hes [sic] made staff and members uncomfortable. [D]idn't get to make a note for a past one because we didn't know his account but a week or 2 ago Brightstar was walking past him and he called out to her and touched her shoulder. [T]here have been other times where members will be doing squats at the smith machines and hell [sic] stand there, watch them and try to have a conversation with them as well.

Mot. at 5:14–19 (citing Feingold Decl., Ex. 1, at 6) (alterations in original). Brightstar is an employee of Saber. Floyd Aff. ¶¶ 13, 17; Mot. at 5 n.1. Floyd denies that he harassed or made uncomfortable any person in the gym. TAC ¶ 17; Pl.'s CSF ¶ 29. Floyd tapped Brightstar on the shoulder while attempting to pass her, but she did not tell Floyd that she had a problem with his actions. TAC ¶ 17. Further, Floyd states that it is "normal behavior" to look at girls doing squats and that no gym members felt harassed by or reported these actions. *Id.* Saber did not provide any identifying or contact information for Brightstar during discovery. Floyd Aff. ¶¶ 13, 17. Saber states that there is no evidence that Brightstar complained about Floyd. Joint Discovery Letter at 4 (ECF No. 107).

Saber asserts that on December 20, 2021, a staff member noted on Floyd's account:

> Member stopped a member at sanitization station and was talking to her. She let him know the convo was done. She walked to front making it clear she was uncomfortable and purchased a lock. He stood there staring at her. We asked him if he needed help, he said no, I am talking to her. We let him know she was done talking. We asked him to leave. He insisted on staying and said stop with this uncomfortable bullshit and started yelling at myself and Majenta. I

6

> told him he needs to leave and my manager would be contacting him.
> He left and the member thanked us and let us know she told him to
> leave when he was talking to her at sanitization station.    We
> apologized for the situation.

Mot. at 5:20–6:1 (citing Feingold Decl., Ex. 1, at 6).  Floyd denies making the member—who he

identifies as "Katherine"—feel uncomfortable.  TAC ¶ 19; Floyd Aff. ¶ 15; Pl.'s CSF ¶ 31.  Floyd

met and conversed with Katherine at the water fountain, and she did not express feeling

discomfort but instead "backed [him] up" to the staff member by saying that she wanted to talk

with Floyd.  TAC ¶ 19.  Floyd was asked to leave before he could purchase a lock for Katherine.

*Id.*  Saber did not provide any identifying or contact information for Katherine during discovery.

Floyd Aff. ¶¶ 15, 17.

The parties agree that Floyd talked to women, touched women on the shoulder in greeting

them, watched women lift weights, flirted with women, and attempted to purchase items for

women while at the Oakland or Milpitas Planet Fitness locations.  TAC ¶ 23; Mot. at 7:27–8:3.

Floyd states that these "are normal acts for a male of heterosexual orientation."  Opp. at 14:3–7.

Saber asserts that Floyd's actions generated complaints that he was "harassing women."  Mot. at

8:3–4.

### 4.    Termination Of The Parties' Membership Agreement

Saber terminated the Agreement on December 29, 2021, at which point Floyd was no

longer permitted to use the Oakland Planet Fitness.  TAC ¶ 20; TAC, Ex. 6; Answer ¶ 20.  Floyd

alleges that after the termination, he was banned from all Planet Fitness locations in the Bay Area.

TAC ¶ 20; *see* TAC, Ex. 6 (ECF No. 52-1, at 30) ("He is banned from ALL PF locations.").

The parties disagree on the reason for termination of the Agreement.  Floyd alleges that

Saber unfairly canceled the Agreement and discriminated against him based on his race and sexual

orientation.  TAC ¶¶ 22–23.  According to Floyd, he has used several commercial gyms since

2010 and did not have problems at any gym until he began using gyms in California in 2021.  *Id.* ¶

11.  Saber asserts that it revoked Floyd's "membership and access, in accordance with the explicit

terms of the Membership Agreement, for numerous incidents wherein he made gym patrons and

employees uncomfortable."  Mot. at 1:11–16.  Romero states that "[t]he cancellation of [Floyd's]

membership was in no way related to his race, gender, or sexual orientation."  Romero Decl. ¶ 9.

United States District Court
Northern District of California

1    Floyd was not notified of the purported complaints against him prior to Saber terminating

2    the Agreement nor was he permitted to refute the complaints.  TAC ¶¶ 22, 31; Floyd Aff. ¶ 17.

3    On December 31, 2021, Floyd emailed Saber and Romero to discuss the purported complaints but

4    did not receive a response.  Opp. at 12:3–5 (citing Opp., Ex. 15 (ECF No. 116-17)).

5    **B.    Procedural Background**

6        On July 3, 2023, Floyd filed his initial complaint in the Alameda Superior Court, Case No.

7    23CV037550, naming "Planet Fitness of Oakland, CA," as the defendant.  Not. of Removal, Ex. A

8    (ECF No. 1-1).  On January 30, 2024, Floyd filed a First Amended Complaint naming Saber.  Not.

9    of Removal, Ex. B (ECF No. 1-2).  Floyd alleged ten causes of action:  (1) 42 U.S.C. § 1981; (2)

10   42 U.S.C. § 2000a; (3) California's Unruh Civil Rights Act (Cal. Civ. Code § 51); (4) Cal. Civ.

11   Code § 51.5; (5) California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200);

12   (6) California's Consumers Legal Remedies Act (Cal. Civ. Code § 1750); (7) Negligent Training

13   and Supervision; (8) "Restatement (Third) of Law, Agency Law, Agency § 7.04, § 7.06, § 7.07, §

14   7.08 – Principal's Liability to a Third Party"; (9) Negligent Infliction of Emotional Distress; and

15   (10) Cal. Civ. Code § 1714.  *Id.*

16       Saber removed the matter to this Court on March 1, 2024, and subsequently moved for

17   dismissal pursuant to Rule 12(b)(6).  ECF No. 6.  On June 11, 2024, the Court granted Saber's

18   motion with leave to amend.  ECF No. 39.

19       On July 11, 2024, Floyd filed a Second Amended Complaint, re-alleging three claims from

20   his previous complaint (violation of the Unruh Act, violation of the UCL, and Negligent Training

21   and Supervision) and adding a new claim under California's Fair Employment and Housing Act

22   (Cal. Gov't Code § 12940).  ECF No. 40.  Saber again moved for dismissal.  ECF No. 44.  On

23   August 23, 2024, the Court granted Saber's motion in part and denied it in part, again with leave

24   to amend.  ECF No. 51.

25       On September 18, 2024, Floyd filed the operative Third Amended Complaint ("TAC"),

26   alleging the following six claims:  (1) California's Unruh Civil Rights Act (Cal. Civ. Code § 51);

27   (2) California's UCL; (3) Negligent Training and Supervision; (4) Breach of Contract; (5) Breach

28   of Implied Covenant of Good Faith and Fair Dealing; and (6) Breach of Implied Duty to Perform

United States District Court
Northern District of California

with Reasonable Care.  ECF No. 52.  Saber again moved for dismissal.  ECF No. 53.  On October 30, 2024, the Court denied Saber's motion.  ECF No. 56.  On November 13, 2024, Saber filed an Answer to the TAC.  ECF No. 57.

On January 6, 2025, Floyd filed a motion for leave to file a Fourth Amended Complaint. ECF No. 64.  On February 10, 2025, the Court denied Floyd's motion.  ECF No. 75.

On June 26, 2025, Saber filed its instant Motion for Summary Judgment, arguing that summary judgment in its favor is appropriate on each of Floyd's claims because Saber was within its contractual right to revoke Floyd's gym membership.  ECF No. 109 ("Mot.").  On July 10, 2025, Floyd filed an Opposition.  ECF No. 116 ("Opp.").  On July 17, 2025, Saber filed a Reply. ECF No. 117 ("Reply").

### III.   LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the task of the Court "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to identify with reasonable particularity the evidence that precludes summary judgment."  *Id.*; *see also Cafasso, U.S. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (noting the nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory

1    allegations") (cleaned up).  Thus, "[t]he district court need not examine the entire file for evidence

2    establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with

3    adequate references so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*,

4    237 F.3d 1026, 1031 (9th Cir. 2001); *see also Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*,

5    626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.")

6    (cleaned up).

7          "While the evidence presented at the summary judgment stage does not yet need to be in a

8    form that would be admissible at trial, the proponent must set out facts that it will be able to prove

9    through admissible evidence."  *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010)

10    (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must

11    be made on personal knowledge, set out facts that would be admissible in evidence, and show that

12    the affiant or declarant is competent to testify on the matters stated.")).  If the nonmoving party

13    fails to identify such evidence, or if it offers evidence that is "merely colorable, or is not

14    significantly probative, summary judgment may be granted."  *Anderson,* 477 U.S. at 249–50

15    (cleaned up).

16                            **IV.   DISCUSSION**

17          Saber requests that the Court grant it summary judgment on each of Floyd's claims

18    because Saber properly revoked Floyd's gym membership when Floyd failed to comply with

19    Saber's policies and rules; as such, Floyd cannot maintain his claims against Saber as a matter of

20    law.  Mot. at 1:1–23.  Saber asserts that it terminated Floyd's Agreement due to incidents at the

21    Oakland Planet Fitness and Milpitas Planet Fitness, "in combination with the multiple incidents

22    that [Floyd] caused at the Fremont and Hayward locations of which [Saber] became aware, and for

23    the safety of the gym patrons and staff."  *Id.* at 6:2–5.

24          Floyd contends that summary judgment is improper because the evidence shows that Floyd

25    "did not cause any problems and perform any actions that would cause a necessary revocation of a

26    gym membership," and that a reasonable jury could conclude that Saber's cancellation of the

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Agreement was discriminatory.[4]  Opp. at 8:18–19, 12:4–7.

In sum, the Court concludes that there are genuine disputes of material fact regarding Floyd's Unruh Act, UCL, Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, and Breach of Implied Duty to Perform with Reasonable Care claims—therefore, summary judgment for Saber on these claims is not warranted.  However, the Court concludes that Floyd fails to adduce evidence of Saber's knowledge which is required for Floyd's Negligent Training and Supervision claim—therefore, summary judgment for Saber on this claim is warranted.

### A.    Evidentiary Issues

Floyd raises objections to the following evidence proffered by Saber:  (1) all evidence of activities prior to the parties' Agreement; (2) notes on Floyd's membership account; (3) emails concerning Floyd's purported misconduct; (4) logs of Floyd's membership access; and (5) the Declaration of Mark Christina.  Opp. at 2:4–6, 6:7–15, 7:17–18, 9:10–12, 20:18–21:4.

#### 1.    Relevance Objections

Floyd objects to all evidence regarding his activities that occurred at other gyms prior to his membership at the Oakland Planet Fitness on the basis that it is not relevant.  *See* Opp. at 6:7–9 ("None of the Plaintiff's issues with other prior gyms are relevant to the Plaintiff's issues during his membership to Defendant's gym.  The entire section should be and is requested to be excluded.").  Saber responds that this evidence is relevant because it "properly relied on reported incidents from other gyms to bolster its decision to revoke [Floyd's] membership."  Reply at 1:18–2:27.

"[O]bjections for relevance are generally unnecessary on summary judgment because they are duplicative of the summary judgment standard itself." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (quoting *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).  "[I]f evidence submitted on summary judgment could create a genuine

---

[4] As a threshold matter, Floyd's Opposition includes arguments based upon FEHA (Cal. Gov't Code § 12940). *See, e.g.,* Opp. at 14:19–21.  However, the Court previously dismissed Floyd's FEHA claim. *See* ECF No. 51.  Therefore, the Court does not consider Floyd's arguments based upon FEHA.

1    dispute of material fact, it is, by definition, of consequence in determining the action, and

2    therefore relevant . . . .  Conversely, if the submitted evidence does not create a genuine dispute of

3    material fact, there is no need for the court to separately determine whether it is relevant because,

4    even assuming it is not, it will not affect the ultimate summary judgment ruling."  *Id.* (cleaned up).

5         Accordingly, the Court **OVERRULES** Floyd's objection to the evidence regarding

6    Floyd's activities prior to the parties' Agreement, as it is duplicative of the summary judgment

7    standard.

8         **2.    Hearsay Objections**

9         Floyd objects to evidence proffered by Saber concerning notes made on Floyd's

10   membership account across several gyms on the basis that it is hearsay.  *See* Opp. at 6:12–13

11   (citing Opp., Ex. 1) ("The California notes begin with a manager in Florida records hearsay about

12   events in California on July 23, 2021."); *id.* at 7:17–18 (citing Opp., Ex. 1) ("And again, there are

13   hearsay notes recorded by an uninvolved third party staff member concerning the September 8,

14   2021 incident.").  Saber does not respond to these objections in its Reply.  Saber does not dispute

15   that these statements are hearsay, and it does not invoke any exceptions to the rule against hearsay.

16        Hearsay is an out of court statement made by a declarant, offered to prove the truth of the

17   matter asserted.  Fed. R. Evid. 801.  Hearsay is not admissible at trial unless permitted by law or

18   allowed under an exception.  *Id.* at 802; *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778

19   (9th Cir. 2002) ("In the absence of a procedural rule or statute, hearsay is inadmissible unless it is

20   defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception

21   under Rules 803, 804 or 807.").

22        However, "[a]t the summary judgment stage, we do not focus on the admissibility of the

23   evidence's form.  We instead focus on the admissibility of its contents."  *Sandoval*, 985 F.3d at

24   666 (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)).  "If the contents of a

25   document can be presented in a form that would be admissible at trial—for example, through live

26   testimony by the author of the document—the mere fact that the document itself might be

27   excludable hearsay provides no basis for refusing to consider it on summary judgment."  *Id.*

28   "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence . . . .  The burden is on the

proponent to show that the material is admissible as presented or to explain the admissible form

that is anticipated."  2010 Adv. Comm. Note, Fed. R. Civ. P. 56.

Here, the account notes proffered by Saber constitute hearsay because Saber seeks to

introduce the notes for their truth—that Floyd's conduct violated the Agreement.  Fed. R. Evid.

801.  But that does not end the inquiry.  The pertinent question is whether the account notes could

be presented in an admissible form at trial.  *Fraser*, 342 F.3d at 1036; *see also Hodges v. Hertz

Corp.*, 351 F. Supp. 3d 1227, 1232 (N.D. Cal. 2018) ("[D]istrict courts in this circuit have

routinely overruled authentication and hearsay challenges at the summary stage where the

evidence could be presented in an admissible form at trial, following *Fraser*.").  Therefore, the

Court must analyze Floyd's hearsay objections by applying this standard.

Floyd first objects to an entry from July 23, 2021, that states:

> Member checks in to San Jose, CA location . . . . Member is very
> disruptive to staff and others throughout the gym.  He also hits on the
> staff members and says vulgar words to other staff members.  Also
> slams weights and had to be talked to by a manager.  This location is
> almost at the point to not letting him work out there.  Chris is the staff
> member I spoke with.

Mot. at 2:21–28 (citing Feingold Declaration, Ex. 1 (Member Notes for Floyd), at 7 (ECF No.

112-1)).  Floyd argues that this is "layers of hearsay" because "JN wrote notes under Rodriguez's

account after speaking with Chris.  It is also not mentioned whether Chris is one of the staff within

these notes, so likely Chris is another layer of hearsay."  Pl.'s CSF ¶ 10.

Next, Floyd objects to an entry from September 8, 2021, by Gabriella Hernandez that is

referenced in the Romero Declaration and states:

> Discrepancy between him and another member, Taking up 2-3
> machines at once, lady tried to use it he said he was, (Greg staff
> member)[.] She went to Greg to talk about the situation and he butted
> in and he said to fucking move and all you had to do was listen.

Feingold Decl., Ex. 1, at 7.  Regarding this entry, Romero states:

> [E]mployees at a Planet Fitness gym located in Hayward, California
> (the "Hayward Gym") called a manager at one of the gyms I
> supervised, informing him of numerous issues Plaintiff caused at the

United States District Court
Northern District of California

1    Hayward Gym.  That manager then informed me of the incidents
     involving Plaintiff at the Hayward Gym.

Romero Decl. ¶ 3; *see* Mot. at 2:21–23 (citing Romero Decl. ¶ 3).  Floyd argues that "[t]hese notes

contain layers of hearsay . . . .  The [records] were recorded by Hernandez, a party not involved in

any way with the dispute between me and a gym patron."  Pl.'s CSF ¶ 13.

     Finally, Floyd objects to an email sent by Cecelia Newman concerning Floyd's purported

misconduct.[5]  *See* Mot. at 3:10–22 (citing Feingold Decl., Ex. 1, at 35–36 ("Newman email")).

Floyd argues that "Newman's email is hearsay and should not be used as evidence in this lawsuit."

Pl.'s CSF ¶ 15.

     The Court finds that Saber does not demonstrate that any of the account notes or emails

regarding Floyd's actions could be presented in an admissible form at trial.  In its Motion, Saber

---

[5] Saber proffered an email that was purportedly sent on September 9, 2021, by Cecelia Newman, the Chief Operating Officer at Planet Fitness, to Planet Fitness World Headquarters, stating:

> The below member, Michael Floyd needs to be canceled right away!!
> I have tried to get in contact with th [*sic*] local group with no help.
> No Manager at the club, the area Director Katie Huff passed me along
> to a Jake Saltzman but still haven't heard back from him.  I reached
> out again this morning with no luck again.  This member has now
> been kicked out of both our Fremont and Hayward locations for not
> wearing a mask, sexual harrasing [*sic*] female members and
> employees, causing issues with male members, yelling and causing a
> sceen [*sic*] on the gym floor, staying for hours on end and having to
> be asked to leave at closing time.  I dealt with him persoannly [*sic*]
> last Thursday in Fremont and told him his behavior was not Ok and
> that it would not be tolerated in our gyms.  He came back over the
> weekend and the staff had the same issue.  Security was called and
> was unable to get him out of the club and they had to call the local
> PD, who after several hours were able to get him to leave.  Then he
> made his way to our Hayward club and caused the same issues.  This
> man is very aggressive and needs to be canceled by his home club
> ASAP so he can't keep getting access to other locations with only a
> "Welcome" note on his home screen.  I have included Lauren from
> the Saber Group to alert her but not sure who we can contact now for
> the local Corporate loactions [*sic*] as Francisco is gone.  That contact
> would be very helpful since we are sharing so many areas now and
> need to have contact with someone in charge of those clubs.  <u>This is
> becoming a very large issues [*sic*] and I really think things need to be
> changed with the recepricol [*sic*] access members so notes can be seen
> that were made the home club.  As well as us being able to note if we
> have issues with the member.  This needs to be addressses [*sic*] at the
> Corporate level right away.</u>

Feingold Decl., Ex. 1, at 35 (emphasis in original).

combines all account notes and emails into a single file, attaches the file to a Declaration from its attorney, and calls it a day. *See generally* Feingold Decl., Ex. 1. In its Reply, Saber does not explain how the hearsay contained within these documents would be presented at trial. For example, Saber does not indicate that it could call staff members to testify about Floyd's misconduct that they witnessed or gym members to testify about Floyd's harassment that they experienced. *Contra Cottrell v. I.C. Sys., Inc.*, No. 2:21 CV 1167, 2022 WL 17582374, at *1 (W.D. Wash. Dec. 12, 2022) (overruling objections to exhibits based on authentication and hearsay, in part, where defense counsel indicated defendants could call an appropriate witness for the exhibits at trial). In fact, Saber previously indicated that it does not have any contact information for witnesses who directly complained about Floyd. *See* Joint Discovery Letter at 3–4, 6–7. Further, although Romero submits a Declaration and is thus presumptively available to testify at trial, Saber does not explain how it could present the hearsay contained within Romero's declaration at trial. *See* Romero Decl. ¶¶ 3–4, 6–8. Therefore, because Saber does not demonstrate that it could cure the excludable hearsay within the account notes, emails, or the Romero Declaration, the Court does not consider these documents on summary judgment. *Sandoval*, 985 F.3d at 666.

Accordingly, the Court **SUSTAINS** Floyd's objections to evidence contained within the account notes (Feingold Decl., Ex. 1, at 6–7), the emails (Feingold Decl., Ex. 1, at 35–36), and the Romero Declaration (¶¶ 3–4, 6–8).

### 3.    Authentication Objections

Floyd objects to evidence proffered by Saber concerning emails that discuss Floyd's purported misconduct. *See, e.g.,* Opp. at 8:3–4 ("The Plaintiff did not disobey any gym rules: those violations stated by Cecelia Newman are fabricated."). Floyd further objects to evidence proffered by Saber showing logs of when Floyd accessed various gyms. *See id.* at 9:10 ("[T]he Defense intentionally provided the Plaintiff incomplete logs of his membership access."). Floyd also objects to evidence concerning his activities at the Milpitas gym. Specifically, Floyd argues:

> The Defendant manipulated its own evidence to ensure Katherine's identification could not be found. Even though the member notes state the Plaintiff accessed the Milpitas location around 12/14 and

> 12/20 (Exhibit 05), there are no records that the Plaintiff accessed any gym between 12/08-12/26 (Exhibit 09). Majenta was an employee at the Milpitas location and wrote those member notes after encounters with the Plaintiff at the Milpitas location. (Exhibit 05, Exhibit 10 int 02). Having no recorded check-ins during that entire period is a clear demonstration of altered evidence.

*Id.* at 9:11–16. The Court construes Floyd's objections as challenging the authenticity of this evidence. Saber does not respond to these objections in its Reply.

"Authentication is a condition precedent to admissibility." *Orr*, 285 F.3d at 773 (cleaned up). To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901.

As with hearsay, the question at the summary judgment stage is whether evidence "can be presented in a form that would be admissible at trial." *Sandoval*, 985 F.3d at 666. In a summary judgment motion, documents may be authenticated through personal knowledge when they are "attached to an affidavit that meets the requirements of Fed. R. Civ. P. 56(e) and the affiant [is] a person through whom the exhibits could be admitted into evidence." *Orr*, 285 F.3d at 774 (cleaned up). However, because unauthenticated evidence is not *per se* excluded at summary judgment, the proponent may show that evidence can be authenticated in any manner permitted by the rules of evidence. *See Lawrence v. City & Cnty. of San Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017) (overruling objections to police reports as improperly authenticated because authors of the reports could testify at trial to their contents based on personal knowledge).

Here, the evidence that Floyd objects to is not properly authenticated by Saber because Saber does not show that the evidence is what Saber claims it is. Fed. R. Evid. 901. But as discussed above, the pertinent question is whether Saber can authenticate the evidence at trial. *Fraser*, 342 F.3d at 1036.

Floyd first objects to the Newman email. *See* Mot. at 3:10–22 (citing Feingold Decl., Ex. 1, at 35–36). Floyd "disputes whether this email was sent" because Saber "has falsified evidence in other places in this lawsuit." Pl.'s CSF ¶ 15. Floyd also objects to emails that followed the Newman email. *See* Mot. at 3:23–28 (citing Feingold Decl., Ex. 1, at 35). Floyd again "disputes whether this email was sent." Pl.'s CSF ¶ 16.

Next, Floyd objects to the logs showing when Floyd checked in to various gyms. *See*

16

United States District Court
Northern District of California

1    Feingold Decl., Ex. 1, at 8–20.  Floyd points out that notes were entered on his membership

2    profile on December 14, 2021, and December 20, 2021, but that the check-in logs do not show

3    Floyd accessing a gym between December 8 and December 26, 2021.  Opp. at 9:10–17 (citing

4    Opp., Exs. 5, 9).  Floyd avers that he accessed the Milpitas Planet Fitness on December 20, 2021,

5    but there is no record of this on the check-in logs.  Floyd Aff. ¶ 15.  Floyd argues that because the

6    check-in logs do not show that Floyd accessed a gym on days that notes were entered in his

7    membership profile, the logs are incomplete and thus falsified.  Opp. at 9:10–17.  Due to this

8    inconsistency, Floyd also objects to the notes in his membership profile that conflict with the dates

9    of the check-ins.  *Id.*

10        As discussed above, the Court does not consider any of the account notes or emails on

11   summary judgment because Saber fails to show how it can overcome the hearsay present in those

12   items.  For the check-in logs, Saber does not indicate in its Reply how it could authenticate these

13   logs at trial.  As with all its documentary evidence, the check-in logs are attached to a Declaration

14   from Saber's attorney.  *See* Feingold Decl., Ex. 1, at 8–20.  Saber does not explain how its

15   attorney can authenticate the check-in logs.  *See Orr*, 285 F.3d at 774 n.8 ("A document can be

16   authenticated under Rule 901(b)(1) by a witness who wrote it, signed it, used it, or saw others do

17   so.") (cleaned up).  Therefore, because Saber does not demonstrate that it could cure the

18   unauthenticated check-in logs, the Court does not consider these documents on summary

19   judgment.  *Sandoval*, 985 F.3d at 666.

20        Accordingly, the Court **SUSTAINS** Floyd's objections to evidence contained within the

21   check-in logs (Feingold Decl., Ex. 1, at 8–20).

22        **4.    Foundation Objections**

23        Floyd objects to the Declaration of Mark Christina (ECF No. 111) because "it offers

24   nothing factual in regards to any California events that other evidence should have uncovered."

25   Opp. at 21:3–4.  Specifically, Floyd argues:

26            At the time of the events within the Defendant's contract with the
             Plaintiff, Mark Christina was not employed nor working with the
27           Defendant.  He was also not in the Bay Area and had nothing to do
             with the legitimacy of the Fremont and Hayward complaints.
28           Christina writes that the Fremont and Hayward incidents are well

documented even though there are no identities of alleged victims, no
declarations from alleged victims, nor declaration from the Plaintiff.
(ECF No. 111 at 3_16).  Just accusations placing Plaintiff at fault.

*Id.* at 20:18–21:2.  The Court construes Floyd's objection as challenging the foundation of the

Christina Declaration.  Saber does not respond to this objection in its Reply.

"A witness may testify to a matter only if evidence is introduced sufficient to support a

finding that the witness has personal knowledge of the matter.  Evidence to prove personal

knowledge may consist of the witness's own testimony."  Fed. R. Evid. 602.  "[A]n objection to

admission of evidence on foundational grounds must give the basis for objection in a timely way

to permit the possibility of cure."  *Sandoval*, 985 F.3d at 666 (cleaned up).  As with other

objections, if a party can cure a defect in foundation, the evidence is properly considered on

summary judgment.  *Id.* at 667.

Here, the Court finds that Saber does not establish a proper foundation for Christina's

averments regarding activities that occurred prior to December 2022.  Christina is the Vice

President, Finance and Controller, for Taymax.  Christina Decl. ¶ 1.  Taymax acquired Saber in

December 2022.  *Id.* ¶ 14.  Although Christina avers that he has "personal knowledge of the

matters" stated in his Declaration, he does not explain how he was personally involved in Floyd's

actions, purported email communications concerning Floyd, purported complaints about Floyd, or

termination of Floyd's Agreement—all of which took place prior to Taymax acquiring Saber.  *Id.*

¶¶ 1–2, 6–15.  In its Reply, Saber does not show how it could cure this defect in the Christina

Declaration; instead, Saber cites to the Christina Declaration for factual support that Floyd caused

incidents at the gyms in Fremont, Hayward, and San Jose.  *See* Reply at 2:1–2 (citing Christina

Decl. ¶ 13) ("[Saber], in fact, considered these incidents, including incidents at the Fremont Gym,

Hayward Gym, and San Jose Gym.").  Therefore, because Saber does not demonstrate that Mr.

Christina had personal knowledge of activities that occurred prior to December 2022, the Court

does not consider these averments in the Christina Declaration on summary judgment.  *Sandoval*,

985 F.3d at 667.

Accordingly, the Court **SUSTAINS** Floyd's objection to evidence in or attached to the

Christina Declaration regarding activities that occurred prior to December 2022.

**B.      Unruh Act Claim**

In his Unruh Act claim, Floyd alleges that Saber discriminated against him based on his race and his sexual orientation.  TAC ¶¶ 22–23.  Saber argues that summary judgment in its favor is appropriate on Floyd's Unruh Act claim because (1) Floyd has not proffered evidence that his alleged protected statuses were a motivating factor in Saber's decision to terminate his membership; and (2) Saber had a legitimate, non-discriminatory reason for terminating Floyd's Agreement.  Mot. at 7:5–9:4.  Floyd contends that he established a *prima facie* case of discriminatory intent and that there is no evidence that he harassed anyone or otherwise violated the Agreement.  Opp. at 11:14–14:7.

The Unruh Civil Rights Act provides:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b).  The Act prohibits "unreasonable, arbitrary, or invidious discrimination." *Dallas and Lashmi, Inc. v. 7-Eleven, Inc.*, 112 F. Supp. 3d 1048, 1062 (C.D. Cal. 2015) (citing *Sunrise Country Club Ass'n v. Proud*, 190 Cal. App. 3d 377, 380 (1987)).  "Unreasonable, arbitrary, or invidious discrimination is present where the defendant's policy or action emphasizes irrelevant differences or perpetuates irrational stereotypes." *Id.* (citing *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 33 (1985)) (cleaned up).  A plaintiff must show that "the defendant is a business establishment that intentionally discriminates against and/or denies plaintiff full and equal treatment of a service, advantage, or accommodation based on plaintiff's protected status." *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 922 (2023); *see also Martinez v. Cot'n Wash, Inc.*, 81 Cal. App. 5th 1026, 1036 (2022) (citing *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 854 (2005)) (explaining that unless the claim is based on an ADA violation, proof of intentional discrimination is necessary to establish an Unruh Act violation).

Claims brought under the Unruh Act follow the *McDonnell Douglas* burden shifting framework. *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000).  At the summary judgment

1    stage, the moving party "has the initial burden to present admissible evidence showing either that

2    one or more elements of plaintiff's prima facie case is lacking or that the adverse . . . action was

3    based upon legitimate, nondiscriminatory factors." *Mackey v. Bd. of Trs. of California State*

4    *Univ.*, 31 Cal. App. 5th 640, 662 (2019) (cleaned up).  "Only if a defendant meets that burden

5    does the burden shift to plaintiffs to show the existence of a triable issue of material fact." *Id.*

6        Here, construing all evidence in the light most favorable to Floyd, the Court finds that a

7    reasonably jury could find that Saber terminated Floyd's Agreement based on Floyd's race or

8    sexual orientation.  Saber argues that Floyd cannot prove a necessary element of his claim—that

9    Floyd's "race, ethnicity, or sexual orientation was a motivating factor in [Saber's] decision to

10   terminate his membership."  Mot. at 7:7–10.  However, Floyd proffers evidence that he is an

11   African American male of heterosexual orientation who was singled out by Saber and treated

12   differently and worse than other gym members.  He was called a "bum," "watched" by staff

13   members, subjected to false reports of harassment, and stonewalled when attempting to obtain

14   crucial evidence.  Floyd Aff. ¶¶ 9, 11–15, 17–18; Opp., Exs. 13–17.

15       It is undisputed that Floyd talked to women, touched women on the shoulder in greeting

16   them, watched women lift weights, flirted with women, and attempted to purchase items for

17   women while at the Oakland or Milpitas Planet Fitness locations.  TAC ¶ 23.  According to Saber,

18   Floyd's actions made women feel uncomfortable and violated the Agreement's Anti-Harassment

19   policy.  Mot. at 8:3–4; Reply at 2:1–14, 3:24–4:6.  To be sure, it is possible that Floyd's actions

20   could make a woman feel uncomfortable or harassed.  But, as discussed above, all of Saber's

21   evidence that Floyd's conduct was in fact improper or harassing is hearsay, and Saber does not

22   demonstrate it will be able to present the contents of that hearsay in an admissible form at trial.

23       Saber admits that Romero told staff to "keep an eye" on Floyd, Reply at 4:24–5:3, which is

24   consistent with his claim that he was singled out.  Saber asserts that staff members reported that

25   Floyd "violated Saber's rules and policies," yet Saber admits it did not investigate the veracity of

26   these reports.  *Id.* at 2:3–4, 4:5–6.  Collectively, while some of this evidence may be

27   circumstantial, it is enough to survive summary judgment because it is not based on pure

28   speculation.  *See Jamison v. Costco Wholesale Corp.*, No. 2:23-cv-09212-SB-MRW, 2024 WL

United States District Court
Northern District of California

1    4406820, at *3 (C.D. Cal. Aug. 30, 2024) (granting summary judgment for defendant on Unruh

2    Act claim because "[s]ubjective beliefs alone are insufficient to demonstrate intentional

3    discrimination"). Therefore, a question of fact exists as to whether Saber terminated the

4    Agreement because of Floyd's protected characteristics or because of a legitimate reason.

5         Moreover, the Court finds that a reasonable jury could find that Saber's termination of

6    Floyd's Agreement was not based on legitimate, nondiscriminatory factors. Saber argues that it

7    "had the ability, *in its sole discretion*," to terminate Floyd's Agreement for violating club rules or

8    for any other reason not prohibited by law. Mot. at 8:17–9:2 (emphasis in original). Saber alleges

9    that Floyd violated the Agreement because Floyd repeatedly "made gym patrons and employees

10   uncomfortable." *Id.* at 1:11–13. But, as discussed above, Saber has not demonstrated that it can

11   produce admissible evidence showing that Floyd made anyone feel uncomfortable. Unlike in

12   other cases, Saber does not provide declarations from witnesses who experienced harassment from

13   Floyd or staff members who observed Floyd harassing others. *Contra Floyd v. 24 Hour Fitness

14   USA, LLC*, No. 23-cv-00871-EMC, 2025 WL 1489716, at *1–3 (N.D. Cal. May 23, 2025) (noting

15   defendant proffered admissible evidence of member declarations describing plaintiff's harassing

16   conduct, employee declarations describing plaintiff's disruptive behavior, and evidence that police

17   removed plaintiff from the premises).

18        Further, contrary to Saber's assertion, Floyd does not "expressly admit" that he harassed

19   persons at the gym. Mot. at 1:14–15; Reply at 2:8–19, 3:24–4:6. Indeed, the crux of Floyd's

20   complaint is that because he did not violate the Agreement, Saber must have terminated the

21   Agreement based on Floyd's race and/or sexual orientation. In the TAC, Floyd states that he was

22   "reported as harassing women" when he merely interacted with women. TAC ¶ 23. While Floyd

23   does not preface his statement with the word "purportedly," Floyd clearly disputes that these

24   reports occurred. *See, e.g.,* TAC ¶ 17; Pl.'s CSF ¶¶ 10, 13, 15, 17, 29, 31. Overall, from the

25   context, Floyd appears to restate Saber's allegations of harassment rather than admit that these

26   incidents actually occurred.

27        Saber's remaining arguments are unpersuasive. Saber does not cite to any authority for its

28   proposition that it can defeat Floyd's claim because it "employed numerous Black or African

1    American staff members" and because "a large portion of [its] member base were Black or

2    African American at the time [Floyd's] membership was cancelled." Mot. at 7:24–26.  Nor does

3    Romero's statement that "[t]he cancellation of [Floyd's] membership was in no way related to his

4    race, gender, or sexual orientation" move the needle. *Id.* at 8:14–16 (citing Romero Decl. ¶ 9).

5    Setting aside the conclusory nature of the statement, at most, this statement shows that there is a

6    dispute of material fact regarding whether Saber's termination was based on a discriminatory

7    motive.  Therefore, summary judgment in Saber's favor is not warranted.

8         Accordingly, the Court **DENIES** Saber's Motion for Summary Judgment on Floyd's

9    Unruh Act claim.

10   **C.    UCL Claim**

11        Saber argues that summary judgment in its favor is appropriate on Floyd's UCL claim

12   because (1) the UCL claim is premised on Floyd's improper Unruh Act claim; and (2) even if the

13   UCL claim is based on a different claim, Saber properly terminated Floyd's Agreement.  Mot. at

14   9:5–25.  Floyd contends that his Unruh Act claim serves as the predicate for his UCL claim and

15   that Saber's business practices were unfair because it failed to document and investigate purported

16   reports of harassment.  Opp. at 14:8–15:3.

17        Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage

18   "in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof.

19   Code § 17203.  The UCL's "purpose is to protect both consumers and competitors by promoting

20   fair competition in commercial markets for goods and services." *Kwikset Corp. v. Superior Ct.*,

21   51 Cal. 4th 310, 320 (2011).  "Unfair competition" includes "any unlawful, unfair or fraudulent

22   business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof.

23   Code § 17200.  Each prong of the UCL is a separate and distinct theory of liability. *Kearns v.*

24   *Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).  The UCL's coverage is "sweeping,

25   embracing anything that can properly be called a business practice and that at the same time is

26   forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180

27   (1999) (cleaned up).

28        Under the UCL's unlawful prong, "[u]nlawful business activity . . . includes anything that

United States District Court
Northern District of California

1    can properly be called a business practice and that at the same time is forbidden by law." *Farmers*

2    *Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377, 383 (1992) (cleaned up).  An action under this prong

3    "borrows violations of other laws and treats these violations, when committed pursuant to business

4    activity, as unlawful practices independently actionable."  *Id.* (cleaned up).

5         "Under the UCL's unfairness prong, courts consider either:  (1) whether the challenged

6    conduct is tethered to any underlying constitutional, statutory or regulatory provision, or that it

7    threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust

8    law; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially

9    injurious to consumers; or (3) whether the practice's impact on the victim outweighs the reasons,

10   justifications and motives of the alleged wrongdoer."  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204,

11   1214–15 (9th Cir. 2020) (cleaned up).  "This standard is intentionally broad."  *S. Bay Chevrolet v.*

12   *Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999).

13        Here, construing all evidence in the light most favorable to Floyd, the Court finds that a

14   reasonable jury could find that Saber's business practices were unlawful.  Under the Unruh Act,

15   Floyd is a member of a protected class.  TAC ¶¶ 22–23; Opp. at 14:5–6.  As discussed above, a

16   reasonable jury could find that Saber discriminated against Floyd based on his protected

17   characteristics.  Because Floyd's UCL claim is directly tethered to Saber's alleged violation of the

18   Unruh Act, the UCL claim also survives summary judgment.  *See Candelore v. Tinder, Inc.*, 19

19   Cal. App. 5th 1138, 1155 (2018) (explaining that a violation of the Unruh Act constitutes violation

20   of the UCL's unlawful prong).  Therefore, summary judgment in Saber's favor is not warranted.

21        Accordingly, the Court **DENIES** Saber's Motion for Summary Judgment on Floyd's UCL

22   claim.

23   **D.    Negligent Training and Supervision Claim**[6]

24        Saber argues that summary judgment in its favor is appropriate on Floyd's Negligent

25   Training and Supervision claim because Floyd has not proffered any evidence (1) that Saber's

26

27   ───────────────────────────
     [6] As a threshold matter, Floyd's Opposition titles this claim, "Negligence / Negligent Training and
     Supervision."  Opp. at 15.  However, in the TAC, Floyd brought a claim only for Negligent

28   Training and Supervision.  TAC at 14.  Therefore, the Court does not consider Floyd's arguments
     and cited cases pertaining to pure negligence claims or negligence *per se*.

                                                     23

United States District Court
Northern District of California

1    "employees were unfit to perform their job duties"; or (2) that Saber "was aware of any

2    employee's prior disposition to create hazard and risk."  Mot. at 10:6–8.  Floyd contends that

3    Romero negligently supervised staff by ordering staff to "harass" Floyd with "bad intentions," that

4    Saber was aware of Romero's actions, and that staff at the Oakland Planet Fitness "were

5    negligently trained to perform their job."  Opp. at 15:4–18:13.

6         Under California law, "an employer may be liable to a third person for the employer's

7    negligence in hiring, supervising, or retaining an employee who is incompetent or unfit."  *Diaz v.

8    Tesla, Inc.*, 598 F. Supp. 3d 809, 832 (N.D. Cal. 2022) (quoting *Delfino v. Agilent Techs., Inc.*,

9    145 Cal. App. 4th 790, 815 (2006)) (cleaned up).  For the employer to be liable, "the employer

10   must have known or should have known that retaining the employee created a particular risk or

11   hazard and that particular harm materializes."  *Id.* (cleaned up).

12        Here, the Court finds that the undisputed evidence shows that Floyd cannot demonstrate

13   that Saber had knowledge that its employees created a hazard.  Floyd alleges that Romero stalked

14   him and falsely accused him of harassment and that Saber knew Romero "had an ulterior motive

15   and supervised his staff with bad intentions for [Floyd] . . . yet it failed to uphold the contract."

16   Opp. at 17:13–15.  But Floyd does not proffer any evidence showing that Saber knew that Romero

17   harassed Floyd and falsely accused him of harassment, and that Saber failed to act.  The only

18   evidence Floyd points to is an email that Floyd sent on December 31, 2021, "outlining the events

19   that transpired and demanding the contract to be reinstated."  *Id.* at 17:14–16; *see* Opp., Ex. 15

20   (Email) (ECF No. 116-17).  While Floyd states in his email that staff members "fabricat[ed]

21   events," this email was sent after December 29, 2021, when Floyd's membership was terminated.

22   Opp., Ex. 15; TAC ¶ 20.  Thus, the email does not show knowledge that Saber's retention of any

23   employees could cause Floyd harm. Therefore, because Floyd cannot prove Saber's knowledge, a

24   required element of his claim, summary judgment for Saber is warranted.

25        Floyd's reliance on *Patterson v. Sacramento City Unified Sch. Dist.*, *Regents of Univ. of

26   California v. Superior Ct.*, and *Delgado v. Trax Bar & Grill* is misplaced.  Opp. at 17:16–18:7

27   (citing *Patterson*, 155 Cal. App. 4th 821 (2007); *Regents*, 4 Cal. 5th 607 (2018); *Delgado*, 36 Cal.

28   4th 224 (2005)).  *Patterson* involved a claim against a school district for negligent supervision of

1  its students. *Patterson*, 155 Cal. App. 4th at 827. And *Regents* and *Delgado* involved negligence

2  claims based on a special relationship. *Regents*, 4 Cal. 5th at 618; *Delgado*, 36 Cal. 4th at 232–35.

3  None of the cases are on point here, where Floyd alleges that an employer negligently supervised

4  its employees.

5  Accordingly, the Court **GRANTS** Saber's Motion for Summary Judgment on Floyd's

6  Negligent Training and Supervision claim.

7  **E.     Breach of Contract Claim**

8  Saber argues that summary judgment in its favor is appropriate on Floyd's Breach of

9  Contract claim because (1) Floyd did not comply with the Agreement; (2) Saber did not breach the

10  Agreement by terminating Floyd's gym membership; and (3) Floyd could not have suffered any

11  damages as a result of Saber's actions. Mot. at 10:28–11:6. Floyd contends that the evidence

12  shows there is an issue of material fact concerning whether Floyd violated the Agreement and that

13  Saber's reason for terminating the Agreement was fabricated. Opp. at 18:14–19:17.

14  To prevail on a breach of contract claim under California law, a plaintiff must prove "(1) a

15  contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

16  damage to plaintiff." *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1352 (2009). "Implicit

17  in the element of damage is that the defendant's breach *caused* the plaintiff's damage." *Id.*

18  (emphasis in original). Whether a party breached a contract is a question of fact. *Locke v. Warner*

19  *Bros.*, 57 Cal. App. 4th 354, 365 (1997).

20  Here, there is no dispute that the parties entered into the Agreement or that Saber

21  terminated the Agreement. TAC ¶¶ 12, 20; Answer ¶¶ 12, 20. The parties' dispute concerns

22  whether Floyd violated the Agreement and whether Saber breached the Agreement by terminating

23  it.

24  Construing all evidence in the light most favorable to Floyd, the Court finds that a

25  reasonable jury could find that Floyd did not violate the Agreement, and that Saber breached the

26  Agreement. Saber again argues that it could not have breached the Agreement because it could

27  terminate the Agreement in its sole discretion. Mot. at 11:7–11. But Saber could not terminate

28  the Agreement for a reason prohibited by law. *Id.* Saber repeatedly asserts that it terminated the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Agreement due to Floyd's "undisputed documented harassment." *E.g.,* Reply at 4:11–12.  As

2    discussed above, Saber has not demonstrated that it can proffer admissible evidence at trial

3    showing that Floyd violated the Agreement by harassing others.  Because Saber has failed to

4    demonstrate that no reasonable jury could find that Saber's termination was based on Floyd's race

5    or sexual orientation, Saber cannot establish that there is no dispute of fact concerning its alleged

6    breach.  In other words, there is a dispute of fact regarding whether Saber breached the Agreement

7    by terminating it for a reason prohibited by law.  In the same token, there is a dispute of fact

8    regarding whether Floyd's actions—admitted or otherwise—violated the Agreement.  Therefore,

9    summary judgment in Saber's favor is not warranted.

10        Saber's argument that even if Floyd did not "engage in the conduct complained about,"

11   Saber is entitled to summary judgment because it "had a good-faith belief that these events

12   occurred" fails.  Mot. at 11:16–22.  Saber mischaracterizes *Cotran v. Rollins Hudig Hall Int'l, Inc.*

13   *Id.* at 11:22–26 (citing *Cotran*, 17 Cal. 4th 93 (1998)).  Saber asserts that under *Cotran*, it need

14   only show that it believed that "more likely than not [Floyd] violated the 2021 Agreement." *Id.* at

15   12:4–6.  Notwithstanding that *Cotran* was an employment termination case, Saber conveniently

16   omits a key part of the holding in *Cotran*:  the defendants "followed an investigation that was

17   appropriate under the circumstances." *Id.* at 11:26–12:1; *see Cotran*, 17 Cal. 4th at 109 ("the

18   question critical to defendants' liability is not whether plaintiff in fact sexually harassed other

19   employees, but whether at the time the decision to terminate his employment was made,

20   defendants, acting in good faith and following an investigation that was appropriate under the

21   circumstances, had reasonable grounds for believing plaintiff had done so").  In contrast, here,

22   Floyd avers—and Saber does not argue otherwise—that no investigation took place.  TAC ¶¶ 22,

23   31; Floyd Aff. ¶ 17; Opp. at 19:10–12.  Therefore, *Cotran* is inapposite.

24        Accordingly, the Court **DENIES** Saber's Motion for Summary Judgment on Floyd's

25   Breach of Contract claim.

26   **F.    Breach of Implied Covenant of Good Faith and Fair Dealing Claim**

27        Saber argues that summary judgment in its favor is appropriate on Floyd's Breach of

28   Implied Covenant of Good Faith and Fair Dealing claim because "the undisputed facts cannot

support that [Saber] acted in such a way to frustrate the terms of the Agreement." Mot. at 13:5–10. Floyd contends that Saber failed to act in good faith when it failed to investigate the purported accusations, refused to discuss any issues with Floyd, and when it considered incidents from gyms that occurred prior to the parties' Agreement in terminating the Agreement. Opp. at 19:9–20:12.

Under California law, "[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz*, 24 Cal. 4th at 349 (emphasis in original). "Just what conduct will meet this criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990). "[A] breach of the covenant of good faith and fair dealing is prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act." *A.L. v. Pleasanton Unified Sch. Dist.*, No. 22-cv-03036-CRB, 2023 WL 5209718, at *3 (N.D. Cal. Aug. 14, 2023) (cleaned up). Whether the covenant has been breached is a question of fact. *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 509 (2001).

To prevail on a claim, a plaintiff must show: "(1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required him to do or that he was excused from having to do; (3) all conditions required for the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff." *Chou v. Charles Schwab & Co.*, No. 21-cv-06189-LB, 2022 WL 1127384, at *6 (N.D. Cal. Mar. 22, 2022).

Here, construing all evidence in the light most favorable to Floyd, the Court finds that a reasonable jury could find that Saber unfairly interfered with Floyd's right to receive the benefits of the Agreement. Saber repeatedly asserts that under the Agreement, it could terminate Floyd's gym membership in its sole discretion. Mot. at 11:7–11; Reply at 4:13–20. To be sure, the implied covenant "cannot be read to require defendants to take a particular action that is discretionary under the contract when the contract also expressly grants them the discretion to take a different action." *Bevis v. Terrace View Partners, LP*, 33 Cal. App. 5th 230, 256 (2019).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  However, "[t]he covenant of good faith finds particular application in situations where one party is

2  invested with a discretionary power affecting the rights of another.  Such power must be exercised

3  in good faith."  *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 372

4  (1992).  Therefore, the question is whether Saber exercised its discretion to terminate the

5  Agreement in good faith.

6  Floyd posits that Saber acted in bad faith when it failed to investigate supposed incidents at

7  any gym and failed to notify Floyd of complaints.  Opp. at 19:9–20:12.  Saber acknowledges that

8  it did not investigate any reported incidents involving Floyd and asserts that whether it "followed

9  up with the gym members is irrelevant to whether [it], in good faith, relied on incidents reported

10  by its staff and by others."  Reply at 2:3–4, 4:2–6.  Saber's assertions go to the heart of the issue—

11  whether Saber terminated the Agreement based on fabricated claims and in turn unfairly interfered

12  with Floyd's right to receive the benefits of his gym membership.  Saber's failure to investigate is

13  especially salient given that it does not show that it can proffer admissible evidence of Floyd's

14  purported misconduct at any gyms.  Therefore, there is a dispute of fact regarding whether Saber

15  acted in good faith when it terminated the Agreement prior to investigating and notifying Floyd of

16  complaints, and summary judgment in Saber's favor is not warranted.  *See Moore v. Wells Fargo*

17  *Bank, N.A.*, 39 Cal. App. 5th 280, 291 (2019) ("[T]he covenant of good faith can be breached for

18  objectively unreasonable conduct, regardless of the actor's motive.").

19  Accordingly, the Court **DENIES** Saber's Motion for Summary Judgment on Floyd's

20  Breach of Implied Covenant and Fair Dealing claim.

21  **G.    Breach of Implied Duty to Perform with Reasonable Care**

22  Saber argues that summary judgment in its favor is appropriate on Floyd's Breach of

23  Implied Duty to Perform with Reasonable Care claim because the claim is a restatement of the

24  improper Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing

25  claims.  Mot. at 13:11–15.  Floyd contends that Saber breached the implied duty by discriminating

26  against him, by failing to investigate or notify him of purported complaints, and by negligently

27  supervising its staff.  Opp. at 20:13–16 (citing TAC ¶ 31).

28  Under California law, there is a "well-settled principle that express contractual terms give

28

rise to implied duties," including "a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done." *Holguin v. Dish Network LLC*, 229 Cal. App. 4th 1310, 1324 (2014) (internal quotations omitted). "The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill and knowledge; the obligation is implied by law and need not be stated in the agreement." *Id.* "Thus, this duty, being implied by law, is 'as much a part of the contract as if expressly set forth.'" *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1249 (N.D. Cal. 2017) (quoting 14A Cal. Jur. 3d Contracts § 248 (2017)).

Here, construing all evidence in the light most favorable to Floyd, the Court finds that a reasonable jury could find that Saber breached the implied duty owed to Floyd under the Agreement. The parties' Agreement constitutes a service contract for Floyd's gym membership at the Oakland Planet Fitness. TAC ¶ 12; Answer ¶ 12; Agreement at 1–2. "A contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner. A negligent failure to do so may be both a breach of contract and a tort." *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 774 (1997). The question is whether Saber failed to use reasonable care in terminating the Agreement. As discussed above, there are questions of fact regarding whether Saber discriminated against Floyd in terminating the Agreement and whether Saber acted in good faith in failing to investigate purported incidents. Similarly, there are questions of fact regarding whether Saber's actions were reasonable in using its discretion to terminate the Agreement. *See id.* (citation omitted) ("[T]he same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts."). Therefore, summary judgment in Saber's favor is not warranted.

Accordingly, the Court **DENIES** Saber's Motion for Summary Judgment on Floyd's Breach of Implied Duty to Perform with Reasonable Care claim.

## V.    CONCLUSION

For the foregoing reasons, Saber's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: July 31, 2025

THOMAS S. HIXSON
United States Magistrate Judge